IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| KELI CALDERONE,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO, ILLINOIS,<br>a municipal corporation;<br>TENAYA WILLIAMS, in her<br>individual capacity; and, ALICIA<br>TATE-NADEAU, in her individual capacity,<br><br>    Defendants. | Case No. 18-cv-7866<br><br>The Honorable Thomas M. Durkin<br><br>Magistrate Judge Jeffrey T. Gilbert |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS WILLIAMS' AND TATE-NADEAU'S MOTION TO DISMISS (DKT. 23) PLAINTIFF'S FIRST AMENDED COMPLAINT**

NOW COMES, Plaintiff, through her undersigned counsels, Cass Thomas Casper, Esq., Christopher Cooper, Esq., and Gianna Scatchell, Esq., and responds in opposition to Defendants Williams' and Tate-Nadeau's Motion to Dismiss ("Motion") Plaintiff's First Amended Complaint ("FAC"). Dkt. 23. For the following reasons, Plaintiff asks the Court to deny the Motion.

**I.    Calderone Has Stated A Second Amendment Claim In Count I.**

    **a.  The Right To Self-Defense Is Covered By The Second Amendment.**

Defendants first argue that there is no constitutional right to self-defense contained in the Second Amendment, but they then spend no time talking about the crucial case in this jurisdiction that establishes such right, *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ("*Moore*").

*Moore* could not be clearer that there is a Second Amendment right to bear arms for self-defense outside of the home. Judge Posner begins his opinion by framing the case with that very question, stating, "the Supreme Court has not yet addressed the question whether the Second Amendment creates a right of self-defense outside the home." *Id.* at 935. He then concludes, based on a plain language analysis, that the "right to bear arms thus implies a right to carry a loaded gun outside the home" and acknowledges that "one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Id.* at 936. Indeed, Judge Posner read *Heller* as inferring from English law "a right to possess guns for resistance, self-preservation, self-defense, and protection against both public and private violence" and that "[t]he Court [in *Heller*] said American law was the same." *Id.* at 937. He also pointed out that "a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment. . ." and that "[a] woman who is being stalked. . .is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public. . ." *Id.* Judge Posner then concluded that "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Id.* He goes so far as to expressly recognize that "a curtailment of the <u>right of armed self-defense</u> requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment. . ." *Id.* at 940. And that "the interest in self-protection is as great outside as inside the home." *Id.* at 941. In the final paragraph of *Moore*, Judge Posner outright concludes that *Heller* means that there is "<u>a right to bear arms for self-defense, which is as important outside the home as inside</u>," and that "[t]he

2

theoretical and empirical evidence (which is overall inconclusive) is consistent with <u>concluding that a right to carry firearms in public may promote self-defense</u>." *Id.* at 942 (emphases added).

But the Court need only further consult Judge Williams' dissenting opinion in *Moore* to further conclude that the decision recognizes a clearly-established right to carry firearms for self-defense outside of the home. *Id.* at 943 (J. Williams). In the dissent, Judge Williams reads *Heller* and *McDonald* as not resolving the question of whether "the Second Amendment also requires a state to allow persons to carry ready-to-use firearms in public for potential self-defense." *Id.* He disagrees with the majority that an historical analysis leads to the conclusion that there was a "widely understood right to carry ready-to-use arms in public for self-defense" "at the time of the founding." *Id.* at 944. Judge Williams concludes his dissent by noting that, "[i]n the absence of clearer indication that the Second Amendment codified a generally recognized right to carry arms in public for self-defense, I would leave this judgment in the hands of the State of Illinois." *Id.* at 954. While Judge Williams might have disagreed with the scope of the majority's opinion, for the present purposes his dissent is just evidence that there is, indeed, a constitutional right to self-defense.

Defendants' merely state about *Moore* that it extended the right "to carry a gun outside one's home." Dkt. 23, p. 5. But that too simplifies *Moore*, which is rife with the language linking the right to bear arms outside of the home to self-defense. All of the quotations just noted from Judge Posner's majority opinion inextricably link the "carrying" of the firearm with "self-defense." Indeed, Defendants' view in this case would mean that there is a right to carry a firearm for self-defense outside of the home, but not to use said firearm for self-defense outside of the home. That view is self-eviscerating by suggesting that *Moore* means that the Second Amendment allows citizens to carry firearms outside of the home, without being able to use them

for the central purpose of so doing that *Moore* weaves throughout: self-defense. What is left of *Moore* if Defendants' narrow reading is correct? Defendants' other cited cases are either pre-*Moore* (such as *Jones v. Cross*, 637 F.3d 841, 848 (7th Cir. 2011); *Scruggs v. Jordan*, 485 F.3d 934 (7th Cir. 2007)), or from other jurisdictions (*Mahoney v. Holder*, 62 F.Supp. 3d 1215, 1222 (W.D. Wash. 2014)); *Mahoney v. Sessions*, 871 F.3d 873 (9th Cir. 2017)). Dkt. 23, p. 5.

Defendants also too narrowly read the FAC when they try to limit it by stating "Calderone does not allege she was terminated because she exercised a Second Amendment right to possess or carry a lawful weapon. . .she was terminated for engaging in *conduct* which culminated in the use of a firearm in self-defense." Dkt. 23, p. 6. Defendants are really arguing about the reasons for Plaintiff's termination with this statement and attempting to imply that Plaintiff was terminated for reasons *other than using a firearm*. But that reading requires that the Court go beyond the pleadings, assume factual issues in Defendants' favor, and jump ahead to a summary judgment motion without the benefit of discovery. At the Motion to Dismiss stage, Plaintiff gets the benefit of factual assumptions and inferences – and, as pleaded, Plaintiff's case is that she was fired for using her lawfully-carried firearm for self-defense. Dkt. 20, ¶¶13, 14, 16, 17, 22, 24, 36, 37, 41, 42, 43. But assumptions and inferences do not even have to be made, for the FAC clearly spells out, using the City's own language, the reasons she was fired: "you shot Selene Garcia about the body" (Dkt. 20, ¶24(a)); "you discharged a firearm and caused injury to another person, to wit: you shot Selene Garcia about the body" (Dkt. 20, ¶24(b)); "Based on the foregoing actions, you engaged in conduct unbecoming. . ." (Dkt. 20, ¶24(c)). The Defendants' attempt to hint that she was fired for other reasons in its Motion, therefore, not only is contrary to the standards for a Motion to Dismiss, but belied by the City's own

4

admissions clearly-pleaded in Paragraph 24 of the FAC establishing exactly why Calderone was fired.

Defendants also are not correct that Calderone pleads only a right to use a firearm in a certain way, for Calderone actually pleads that the individual Defendants "deprived CALDERONE of her Second Amendment *right to keep and bear arms for self-defense* by terminating her employment as a PCO II because CALDERONE used her lawfully carried firearm in self-defense." Dkt. 20, ¶43 (emphasis added).

Accordingly, based on the foregoing, Defendants Motion is incorrect, there is a Second Amendment right to keep and bear arms for self-defense.

### b. The Defendants Are Not Entitled To Qualified Immunity Because The Right Is Clearly-Established In This Jurisdiction And They Violated It.

The foregoing discussion of what Judge Posner calls "a right to bear arms for self-defense" (*Moore*, 702 F.3d 933 at 942) undermines any claim to qualified immunity in this case. Nonetheless, Defendants claim qualified immunity, stating, "there is no clear authority establishing a *Second Amendment* right to *shoot* someone in self-defense during a traffic dispute." Dkt. 23, p. 6. Defendants then state that Plaintiff was "not disciplined for possessing or carrying a weapon" and claim "[q]ualified immunity is warranted given the lack of clearly established Second Amendment precedent." Dkt. 23, p. 7. As noted in the prior section, there is absolutely a clearly-established right to carry and possess a firearm for self-defense in this jurisdiction, and Defendants' reach to other jurisdictions to attempt to muddy the waters in this jurisdiction is unavailing. For example, Defendants cite *Congden v. Michigan Dep't of Health and Human Servs.*, 2018 WL 2431605 (E.D. Mich. May 29, 2018) for the proposition that qualified immunity should apply in this case due to lack of clear precedent. However, *Moore* is the law in this jurisdiction, not *Congden*. *Moore* is clear precedent in this jurisdiction, and

Defendants do not even attempt to explain how *Moore* does contain a clearly-established right to carry firearms outside the home for self-defense. As noted, such language is all over the *Moore* opinion. *See Moore*, 702 F.3d 933 at 942 ("a right to bear arms for self-defense").

In any event, Defendants too generously state the law of qualified immunity in this jurisdiction. For example, in *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 798 (7th Cir. 2016) the Court of Appeals made clear that "'general statements of the law are not inherently incapable of giving fair and clear warning, and in [certain] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" *Kristofek*, 832 F.3d, 785 at 798 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Lynch v. Ackley*, 811 F.3d 569, 578-79 (2d Cir. 2016) ("'clearly established law' is satisfied if the law on subject was defined at the time with reasonable clarity *or clearly foreshadowed* in rulings of the Supreme Court or the Second Circuit. . ." (emphasis added)). Further, Defendants' only cited case, *Congden v. Michigan Dep't of Health and Human Services*, 2018 WL 2431605, at *4 (E.D. Mich. May 29, 2018) was about a man carrying a semiautomatic rifle in his home, about which the Court stated, "it cannot be said that *Heller* clearly established a constitutional right to carry *such a weapon*, regardless of whether it is possessed within the home." *Id.* (emphasis added). Qualified immunity was applied in that case because the Court found no clearly-established right to carry *that kind* of weapon even within the home under *Heller*. *Id.* Moreover, *Congden* even reads *Heller* as identifying "self-defense as the 'central component' of the right to bear arms," and, to that extent, the case establishes all the more that Plaintiff here does plead a clearly-established constitutional right. *Id.* (quoting *Heller*, 554 U.S. 570 at 500).

Defendants next claim that, assuming there is a clearly-established right to self-defense, it is unclear if Tate-Nadeau's and Williams' decision to terminate Calderone violated that right. On this front, Defendants again improperly turn their Motion into a Motion for Summary Judgment and fill it with their lawyers' unverified characterizations of the videotape that shockingly imply that the Judge's decision in the criminal case was wrong.[1] Dkt. 23, pp. 7-8; Dkt. 20, ¶20 (pleading allegations regarding Directed Verdict). Again, Tate-Nadeau and Williams have already stated why they terminated Calderone, which is pleaded Paragraph 24(a) – (c) – they fired her for shooting Selene Garcia about the body. Not only is Paragraph 24 given the assumption of truth at this stage, but, as pleaded, such language is *verbatim* from the City's termination documents. Dkt. 20, ¶24. To the extent Defendants are asking the Court to enter summary judgment, it should be noted that Defendants are already backstepping in their Motion about the reasons underlying their termination decision. That very effort to change the reasons underlying their termination decision shows that Defendants know they violated Calderone's Second Amendment rights and now want to change the basis for her termination to avoid that outcome. But *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012), cited by Defendants, supports Plaintiff here because officials of reasonable competence could not disagree that firing Calderone for "[shooting] Selene Garcia about the body" violated Calderone's Second Amendment right to bear arms for self-defense as was clearly-established in *Moore* by the time the Defendants fired Calderone for this. Defendants' arguments about "reasonable minds" differing about moments in the video again attempts to change the City's already-stated bases for terminating Calderone: because she shot Selene Garcia, and that fact

---

[1] Such treatment of this issue is exactly demonstrative of the why there is a liberty interest deprivation that has and is occurring in Count V.

violated three of the City's Personnel Rules. Dkt. 20, ¶24. Those allegations are what City itself used in its termination charges, and it is the City's' decision to terminate Calderone on those charges that violated her Second Amendment rights.

Accordingly, the individual Defendants' qualified immunity defense should be rejected.

## II.     Calderone Has Stated A Procedural Due Process Claim In Count II.

Defendants cite to *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008) and Plaintiff agrees that the "random and unauthorized" line of due process cases apply to her in that there are non-existent and inadequate remedies for her situation. *Yahnke v. County of Kane*, 2017 WL 1980248, *6 (N.D. Ill. 2015) (J. St. Eve), is a good example for how such a claim operates. In that case, the Court recognized that "[w]hen determining what process is due in the context of unauthorized deprivations of a protected property right, if there is an adequate post-deprivation state law remedy available, this remedy is all the process a plaintiff is due." While *Yahnke* recognized that the ARL is a state law remedy for purposes of this analysis, it also recognized that the plaintiff bringing a due process claim must show that "the state law post-deprivation remedy was inadequate." *Id.* (citing *Bettendorf v. St. Croix County*, 631 F.3d 421, 427 (7th Cir. 2011)). "A state law remedy is inadequate if it is meaningless or nonexistent." *Id.* So too, *Schoen v. City of Milwaukee*, 2014 F.Supp.3d *3 (E.D. Wis. 2014), recognized that a complaint may state a valid procedural due process objection where it includes "a challenge to the fundamental fairness of the state procedures," and where the state remedy available "in no way can be said to provide the due process relief guaranteed by the fourteenth amendment." *Id.* (citing *Easter House v. Felder*, 910 F.2d 1387, 1406 (7th Cir. 1990)). *Kahlily v. Francis*, 2008 WL 5244596, *2 (N.D. Ill. 2008) provides a means of analyzing whether or not there are *adequate* state remedies by first assessing whether there is a remedy in state law, and then analyzing whether the remedy is meaningless. *Id.* at *3. In that case, Judge Kendall found that

there was a state law remedy for conversion that plaintiff could assert for allegations that a police officer stole his belongings, although because the plaintiff did not allege that he availed himself of that remedy, he did not implicate due process. With respect to the adequacy of state remedies, Courts in this district have held that the lack of state procedures to provide complete redress, including lack of a monetary remedy, are meaningless and inadequate remedies. *See Sturdevant v. Haferman*, 798 F.Supp. 536, 540-41 (E.D. Wis. 1992); *Smith v. McCaughtry*, 536, 540-41 (E.D. Wis. 1992).

Here, Calderone cannot file a state court ARL complaint, she has no post-deprivation remedy under any City ordinance for her termination (and Defendants cite to none), and she cannot meet the criteria for a mandamus or declaratory judgment action. She also asserts that the pre-deprivation hearing she was given was a sham with a predetermined outcome that made no difference. Dkt. 20, ¶28 (alleging she was given no *bona fide* pre-deprivation hearing). What, then, is Calderone's state law remedy for the Defendant's failure to provide a *bona fide* hearing? Defendants' answer that the union grievance was adequate; however, the collective bargaining agreement provides that only the Union and the Employer may submit a grievance to arbitration, which means precisely that Calderone herself had no access to a post-deprivation hearing. Dkt. 23, Ex. C, p.13. The City also mischaracterizes Calderone's attorney's request, which included to "hold these charges in abeyance" until her criminal case was completed. Dkt. 23, Ex. A, p.3. The City declined to hold the charges in abeyance and fired her on those charges without providing further post-deprivation hearing, until it decided to reinvigorate the grievance *after* this lawsuit was filed. Paragraphs 57 through 59 plead that the City only magically became interested in arbitrating Calderone's situation after this lawsuit was filed so that the City can do exactly what it is doing in its Motion here. Dkt. 20, ¶¶57-60. The City tries to blame this all on

9

Calderone in its Motion, yet, notably, the City never explains how, when, or where it offered Calderone a post-deprivation hearing in its Motion.

The City relies on *Ores v. Village of Dolton*, 152 F. Supp. 3d 1069, 1087 (N.D. Ill. 2015) for the proposition that Calderone could seek declaratory, mandamus, or injunctive relief for her termination, yet the City never explicates how those theories would be meaningful legal avenues that would provide *adequate* remedies. Mandamus, for example, "is an extraordinary remedy to enforce, as a matter of right, the performance of official duties by a public officer where no exercise of discretion on his part is involved." *Lewis E. v. Spagnolo*, 186 Ill.2d 198 (1999). Mandamus can "compel a public official to perform a purely ministerial duty" and "will be awarded only if a plaintiff establishes a clear, affirmative right to relief, a clear duty of the public official to act, and a clear authority in the public official to comply with the writ." *People ex rel. Ryan v. Roe*, 201 Ill.2d 552, 778 N.E.2d 701, 703 (2002). *Ores* was an easy case for mandamus because under the Illinois Municipal Code, there is no authority for a Police Chief to suspend an officer for more than five days under the Municipal Code. *Ores*, 152 F. Supp. 3d 1069 at 1086. OEMC has no such limitation on its authority to terminate, so Plaintiff cannot state a viable mandamus claim. *Battle v. Alderden*, 2015 WL 1522943, *4 (N.D. Ill. 2015), similarly held that a mandamus action was available for a suspended officer, yet in that case the plaintiff alleged that his suspension was contrary to state procedures outlined in the Cook County Sheriff's Merit Board Act, 55 ILCS 5/3-7012. All of the cases cited in *Battle*, including *Genius v. County of Cook*, 2011 WL 9558925, *16-17 (1st Dist. 2011) and *Chriswell v. Rosewell*, 70 Ill.App.3d 320, 324 (1st Dist. 1979), involved situations similar to *Ores* where there was a state law on which the plaintiff could "hook" a mandamus claim. There is no such state law "hook" for OEMC employees in Chicago, and the Defendants do not point to one either. Again, what law would

Calderone use to base her mandamus claim here? The answer is there is not one and she cannot do it.

The same reasons undermine Plaintiff's ability to seek relief via state law declaratory judgment or injunction: what legal rights would those claims be based on? *Ores*, again, based the availability of those avenues on the clear violation of the Municipal Code that occurred in that case – a police chief cannot suspend for more than five days. The Court, there, recognized that "[l]ike mandamus, both of these state-court actions can be used to challenge "the period of suspension where the suspending officer is without authority" or "exerts [power] in a manner in contravention of statute." *Id.* at 1087 (citing *Fruhling v. Champaign Cty.*, 95 Ill.App.3d 409 (1981)). There is no corresponding legal limitation on the individual Defendants' power to terminate here, Defendants do not point to where such a limitation exists, and there is no legal ground for Plaintiff to base a declaratory judgment or injunction action– what legal rights would she be seeking to have declared in a declaratory judgment action? Success on the merits of what underlying complaint for purposes of injunctive relief? That Plaintiff is entitled to due process under the 14th Amendment? Because Plaintiff has brought that claim in Count II in this case. Defendants are bizarrely suggesting that, before Plaintiff can bring a procedural due process claim in federal court, she must first bring a procedural due process claim in state court via a declaratory judgment and/or injunction action. If Plaintiff cannot get relief there, then, under Defendants' theory, she is allowed to strip her claim of the declaratory judgment and injunction shell and bring a pure 14th Amendment claim in federal court under § 1983. This is absurd.

Defendants attack Plaintiff for not apprising the Court that Plaintiff has been reinstated and had a scheduled arbitration hearing on back pay on February 14, 2019. What they leave out is that Plaintiff was *not* reinstated until *after* Plaintiff filed her First Amended Complaint on

January 27, 2019, and that the City was recalcitrant and obstructive at the "arbitration hearing" that turned into a mediation that the City left on its own without resolving anything. To date, there *still* has been no arbitration hearing, there *still* has been no back pay or make whole relief for Calderone, and Calderone submits that the entire "arbitration hearing" that occurred on February 14, 2019 did not resolve anything because the City only participated so it could tell this Court about it in this Motion, just like the City got interested in arbitration only *after* this case was filed. Dkt. 20, ¶¶57-60. Of course, these facts are not plead because all of this occurred after the filing of the First Amended Complaint, but Plaintiff may also suggest facts outside the First Amended Complaint in responding to a Motion to Dismiss. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010) (plaintiffs may suggest facts outside of the pleading showing that a complaint should not be dismissed).

      The City's gamesmanship with the arbitration process should also not be rewarded by dismissing Count due to the "arbitration" that still has not materialized. Allowing the City to resurrect an arbitration process after a lawsuit is filed in this manner hurts the plaintiff's bar and the Courts by requiring plaintiff's lawyers to bring, and Courts to hear, claims such as Count II in this case, just for the City then to decide after the suit is filed that it will arbitrate a case after all, probably because it suits the City strategically and financially to arbitrate the claim rather than deal with the suit. This kind of sandbagging should be rejected by this Court, especially where the Collective Bargaining Agreement does not give Calderone the ability to pursue an arbitration but puts that between the Union and the City. Dkt. 23, Ex. C, p.13, 15. The fact that this is gamesmanship by the City is underscored by Footnote 6 in its Motion, where it states that the City objected to postponing an arbitration. But the CBA also states that "time limitations. . .are of the essence" and "any request for arbitration not in compliance therewith shall not be

considered arbitrable, unless said time limitations <u>are extended by written agreement</u>. . ." Dkt. 23, Ex. C, p. 15. So why is the City "agreeing" to an arbitration not in compliance with the CBA's timelines that it claims it objected to postponing, when the CBA says time is of the essence and the City did not agree to extend because it objected to postponement? The answer is because the City is resurrecting an arbitration process to try to avoid this suit.

Finally, Plaintiff claims that her pre-deprivation hearing was a sham and a fraud hearing. Dkt. 20, ¶¶28-30. In *McGreal v. Village of Orland Park*, 2013 WL 3984477, *8 (N.D. Ill. 2013), Judge Lefkow recognized that pre-termination hearing claims of due process violations are not foreclosed by the existence of state law remedies. Plaintiff has stated that she was given a pre-termination hearing that was a sham and fraud and was the same as receiving no hearing. Dkt. 20, ¶¶28-30. These kinds of claims are recognized due process ones. *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 164 (J. Frankfurter, concurring); *Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir. 1982).

For the foregoing reasons, Defendants' Motion should be denied.

### III. Calderone Has Stated A Procedural Due Process Claim In Count V.

Defendants quibble about the adequacy of the occupational liberty deprivation stated in Count V, but this is not summary judgment. The pleading standards for deprivation of a liberty interest are not as broad as Defendants claim, and she must only plead (1) damage to her good name, reputation, honor, and integrity, and (2) the inability to pursue the occupation of her choice because of the label. *See, e.g., Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013). Indeed, in *Mann*, the Seventh Circuit found a deprivation of a liberty interest adequately stated where an employee was subjected to a protective plan that prevented her from working in her chosen field of child welfare. This case pleads much the same in Paragraphs 80 through 83, which allege that Plaintiff's very public and high-profile firing prevented her from obtaining other employment in

13

police work or police dispatching. She has plead enough. However, if the Court should find the Count is not adequately stated, Plaintiff requests leave to file a Second Amended Complaint to address any such deficiencies.

## **CONCLUSION**

For the foregoing reasons, Plaintiff requests that this Honorable Court deny Defendants Williams' and Tate-Nadeau's Motion to Dismiss Plaintiff's First Amended Complaint in its entirety. Dkt. 23.

Respectfully submitted,

*/s Cass T. Casper*

_____
Plaintiffs' Attorneys
Electronically filed: March 15, 2019

*Cass T. Casper, Esq.*
TALON LAW, LLC
79 West Monroe Street, Suite 1213
Chicago, Illinois 60603
P: (312) 351-2478 F: (312) 276-4930 E: ctc@talonlaw.com

*Christopher Cooper, Esq.*
Law Offices of Christopher Cooper, Inc.
79 West Monroe Street, Suite 1213
Chicago, Illinois 60603
P: (312) 371-6752 E: cooperlaw3234@gmail.com

*Gia Scatchell, Esq.*
Law Offices of Gia Scatchell
360 West Hubbard, 1404
Chicago, Illinois 60654
P: (312) 248-3303 E: gia@lawfirm.gs

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that the foregoing document and all attachments and supplements thereto were served upon counsel for Defendants noted below via this Court's ECF filing system, and that such counsels are registered e-filers.

| | |
|---|---|
| Mark Bereyso, Esq. | mark.bereyso@cityofchicago.org |
| Jessica Durkin, Esq. | jessica.durkin@cityofchicago.org |

*s/Cass T. Casper*