| | |
|---|---|
| KELI CALDERONE, | |
| Plaintiff, | No. 18 C 7866 |
| v. | Judge Thomas M. Durkin |
| CITY OF CHICAGO; TENAYA WILLIAMS; and ALICIA TATE-NADEAU, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Keli Calderone alleges that her employer, the City of Chicago, violated her Second and Fourteenth Amendment rights when she was fired after shooting another person with a gun during an altercation. The City and the Calderone's supervisors—Tenaya Williams and Alicia Tate-Nadeau—have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). R. 23; R. 25. Those motions are granted.

## Legal Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat'l Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide a defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed

factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Background

As Calderone was driving her car on July 19, 2017, she was involved in an altercation with another driver. At this early stage of the case, the record does not reflect what triggered the dispute. But a video recording submitted with Defendants' motions shows that, at one point, the other driver threw a drink into Calderone's car. The other driver then pulled off the road into a driveway. Calderone followed, stopping her car behind the other driver's car and partially blocking a lane of traffic. Calderone and the other driver each got out of their cars and began arguing. After arguing for about one minute, the other driver got back in her car and attempted to drive away, but Calderone stood in front of the car, blocking its path. The other driver got out of her car again and pushed Calderone out of the way several times, eventually throwing her to the ground. Calderone then shot the other driver with a gun.

Calderone was arrested and charged with attempted murder. She was indicted in August 2017. She argued self-defense and was acquitted after a bench trial in October 2018.

Calderone is employed as a "Police Communications Operator II" ("PCO II") with the City of Chicago's Office of Emergency Management & Communications ("OEMC"). After her arrest but before her acquittal, Defendants administratively charged Calderone with violating City of Chicago Personnel Rules XVIII, Section 1, Subparts 15, 23, and 50, which prohibit:

> Engaging in any act or conduct prohibited by the Municipal Code of the City of Chicago, the Illinois Compiled Statutes, applicable laws of other states, or federal statutes.

> Discourteous treatment, including verbal abuse, of any other City employee or member of the public.

> Provoking or inciting another employee or member of the public to engage in such conduct.

> Conduct unbecoming an officer or public employee.

R. 20 ¶¶ 24, 65. The charge under Subpart 15 specifically noted that Calderone had "violated 720 ILCS 5/12-3.05(e)(1) ('Aggravated Battery—Offense Based on Use of a Firearm')." *Id.* ¶ 24.

Defendant Tenaya Williams, OEMC's Deputy Director of Legal/Labor, informed Calderone that OEMC was seeking Calderone's termination. A pretermination hearing was conducted, which Calderone alleges was a "sham . . . pervaded by negative animus [and] hype from negative press about the shooting, [and] hype and bias and concern based on unrelated police shootings such as the Van

Dyke case." R. 20 ¶ 28. After the hearing, OEMC's Executive Director, Defendant Alicia Tate-Nadeau, informed Calderone that she was terminated, effective December 6, 2017.

Calderone was reinstated sometime after her acquittal in October 2018. *See* R. 23 at 11 n.6. An arbitration hearing to determine back-pay owed to Calderone took place on February 14, 2019. *See id.*; R. 33 at 11-12. Calderone brings the following claims: (1) Second Amendment violation for retaliatory termination (Counts I & III); (2) Fourteenth Amendment deprivation of property interest in employment against the individual defendants (Count II); (3) Fourteenth Amendment deprivation of liberty interest in occupation (Count V); (4) the City's personnel rules are unconstitutionally vague and overbroad (Count IV); and (5) indemnification of the individual defendants by the City (Count VI).

## Analysis

### I.     Second Amendment

#### A.     Substantive Violation

Calderone alleges that she was fired in retaliation for exercising her Second Amendment right to bear arms for self-defense. Since most employment-retaliation claims brought under § 1983 involve First Amendment rights, this Court has previously adopted the same framework in analogous challenges that involve the Second Amendment. *See Kole v. Village of Norridge*, 2017 WL 5128989, at *18-19 (N.D. Ill. Nov. 6, 2017); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 387 (6th Cir. 1999) ("[C]ertain provisions of the Constitution define individual rights with which

the government generally cannot interfere—actions taken pursuant to those rights are 'protected' by the Constitution."). On a retaliation claim, a plaintiff must prove that "(1) he engaged in protected activity; (2) he suffered a deprivation likely to deter future protected activity; and (3) his protected activity was a motivating factor in the defendants' decision to retaliate." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018).

### 1. Protected Activity

Whether Calderone has sufficiently alleged protected activity—the first element of her retaliation claim—depends on whether her conduct falls within the scope of activity protected by the Second Amendment. *See Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011) ("First, the threshold inquiry in some Second Amendment cases will be a 'scope' question: Is the restricted activity protected by the Second Amendment in the first place?"). In *District of Columbia v. Heller*, the Supreme Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." 554 U.S. 570, 634-35 (2008). After analyzing evidence regarding the originally intended scope of the Second Amendment, the Supreme Court held that the Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635; *see also Binderup v. Attorney Gen. U.S.A.*, 836 F.3d 336, 358 (3d Cir. 2016) ("In *Heller*, the Supreme Court held the Second Amendment protects an individual right to possess a firearm unconnected to service in a militia, and to use that weapon for traditionally lawful purposes, such as self-defense within

the home."). On this basis, Calderone argues that her conduct is within the Second Amendment's scope, adding that the "central purpose" of possessing and carrying a gun is "being able to use [it]," and that carving "use" out of "possession" would "eviscerate" the Second Amendment. R. 33 at 3-4.

*Heller*, however, did not concern the *use* of a gun in an act of self-defense, but only possession of a gun that would *enable* a person to engage in self-defense. This limitation of *Heller's* holding has been noted by courts and commentators. *See United States v. Morsette*, 622 F.3d 1200, 1202 (9th Cir. 2010) ("[N]either [*Heller* nor the subsequently decided *McDonald*] purports to change, or even to comment on, the law as to the definition of self-defense in a criminal case. Indeed, neither case concerned the use of a weapon, as distinct from mere possession[.]"); *Wrenn v. D.C.*, 864 F.3d 650, 664-65 (D.C. Cir. 2017) ("At a minimum, then, the Second Amendment must *enable* armed self-defense by commonly situated citizens . . . . This analysis reflects the most sensible way of spelling out Second Amendment rights.") (emphasis added); *id.* at 668 ("[T]he law-abiding citizen's right to bear common arms must *enable* the typical citizen to carry a gun.") (emphasis added); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1483 (2009) ("one purpose of the right is to preserve people's *ability* to use weapons in self-defense") (emphasis added).

Left unanswered by *Heller*, and—as far as this Court can tell—any other case since, is the question of whether the Second Amendment protects the right to actually

use a gun in self-defense.[1] Certainly, the right to be able to engage in self-defense also implies a right to the availability of the assertion of self-defense in legal proceedings. *Cf. McDonald v. City of Chicago*, 561 U.S. 742, 888 (2010) (Stevens, J. dissenting) ("And it is true that if a State were to try to deprive its residents of any reasonable means of defending themselves from imminent physical threats, or to deny persons any ability to assert self-defense in response to criminal prosecution, that might pose a significant constitutional problem. The argument that there is a substantive due process right to be spared such untenable dilemmas is a serious one."). The right to be able to engage in self-defense would be worthless otherwise.

But historical legal commentary and custom indicate that the question of whether a particular actual use of a gun constitutes self-defense is a question left to criminal and tort law, about which the Second Amendment is silent. Looking to one of the primary historical sources the Supreme Court relied on in *Heller*—a treatise by Thomas Cooley—no mention is made of "use" of a gun as being within the Second Amendment's scope. *See* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union*, chap. X, at p. 350 (1868) (available at https://repository. law.umich.edu/books/10/).[2] Neither is there a mention of actual use in Cooley's later

---

[1] The Ninth Circuit "assumed without deciding" that municipal regulation of police use of firearms "burdens conduct falling within the scope of the Second Amendment" right to self-defense. *Mahoney v. Sessions*, 871 F.3d 873, 879 (9th Cir. 2017), *cert. denied sub nom. Mahoney v. City of Seattle*, 138 S. Ct. 1441 (2018).

[2] Here's the entirety of Cooley's discussion of the Second Amendment:

treatise, also cited by the Supreme Court in *Heller*. *See* Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America*, § IV (1880) (available at https://www.constitution.org/cmt/tmc/pcl.htm). Indeed, in the 1880 treatise, Cooley emphasized that to the extent that the Second Amendment "implies something more than the mere keeping [of arms]; it implies the learning to handle and use them in a way that makes those who keep them *ready* for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." *Id.* (emphasis added); *see also Ezell*, 651 F.3d at 704 (enjoining a municipal ban on shooting ranges because the "right to possess

---

Among the other safeguards to liberty should be mentioned the right of the people to keep and bear arms. A standing army is peculiarly obnoxious in any free government, and the jealousy of such an army has at times been so strongly demonstrated in England as to lead to the belief that even though recruited from among themselves, it was more dreaded by the people as an instrument of oppression than a tyrannical monarch or any foreign power power. So impatient did the English people become of the very army that liberated them from the tyranny of James II. that they demanded its reduction even before the liberation became complete; and to this day the British Parliament render a standing army practically impossible by only passing a mutiny act from session to session. The alternative to a standing army is "a well-regulated militia;" but this cannot exist unless the people are trained to bearing arms. The federal and State constitutions therefore provide that the right or the people to bear arms shall not be infringed; but how far it may be in the power of the legislature to regulate the right we shall not undertake to say, as happily there neither has been, nor perhaps is likely to be, much occasion for a discussion of that question by the courts.

Cooley (1868) at 350.

firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."). Neither do contemporary commentators consider regulations of actual use to infringe on the scope of the Amendment's protections. *See* Volokh, 56 UCLA L. Rev. 1443 (no mention of actual use in a discussion of regulatory activity that implicates the Second Amendment).

Furthermore, "the States have always diverged on how exactly to implement this interest, so there is wide variety across the Nation in the types and amounts of force that may be used, the necessity of retreat, the rights of aggressors, the availability of the 'castle doctrine,' and so forth." *McDonald*, 561 U.S. at 888 n.32 (Stevens, J. dissenting). The starkest example being the existence of "stand your ground" laws in some states but not others. And not only are the statutory and common law standards different among jurisdictions, but judicial opinions and jury verdicts applying these standards do not always treat like actions alike. *See*, *e.g.*, V.F. Nourse, *Self-Defense and Subjectivity*, 68 U. Chi. L. Rev. 1235 (2001); Kenneth W. Simons, *Self-Defense: Reasonable Beliefs or Reasonable Self-Control?*, 11 New Crim. L. Rev. 51, 90 (2008). Considering the variety of self-defense law historically present across the nation, it is unlikely that the Second Amendment was intended to reach this area of law customarily left to the states to regulate through criminal and tort law. The Court is unaware of any authority indicating that the Second Amendment is relevant to the question of under what circumstances violent action is legally justified as self-defense.

It is a difference of opinion on this kind of question that underlies Calderone's claims in this case. Calderone was indicted for attempted murder and acquitted after arguing self-defense. In the interim, Defendants determined that her actions—stopping her car to engage in an argument with a member of the public while she was armed, and eventually shooting that person on a public street—were not legally justified. Since the Second Amendment is silent as to whether Calderone's actions constitute self-defense, Defendants' actions in evaluating her actions in that regard are outside the Second Amendment's scope. Thus, Calderone has failed to state a claim for violation of the Second Amendment, and her claim must be dismissed.

## 2. Motivating Factor

Even if Calderone's actions are within the scope of rights conferred by the Second Amendment, Calderone has also failed to plausibly allege that her termination was motivated by her use of a gun in self-defense. It is simply not plausible that an employer would fire an employee for defending themselves against imminent harm.[3] And in any event, Calderone's actions were far from a clear case of self-defense.

---

[3] True, some employers prohibit employees from taking violent action against intruders who intend to steal the employer's merchandise, because the employer does not want employees to escalate an already dangerous situation. *See Hoven v. Walgreen Co.*, 751 F.3d 778 (6th Cir. 2014); *Ray v. Wal-Mart Stores, Inc.*, 359 P.3d 614 (Utah 2015). But the point of those employer decisions is to protect employees and customers from being faced with truly imminent harm. And the issue in this case is entirely different.

Calderone got out of her car on a public street to pursue an altercation with a member of the public, culminating in her action to severely injure the other driver by shooting her with a gun. Whether Calderone ultimately acted in self-defense is not the point. Whether Calderone was the initial instigator is also not the point. Even if, as Calderone alleges, Defendants neglected to watch the video recording of the incident before deciding to fire Calderone (and the video does not help Calderone's case), Defendants knew that Calderone decided to stop her car and engage in an argument with a member of the public on a public street when she was armed. Calderone's decision to pursue an altercation rather than driving away or seeking police assistance was the underlying outrageous aspect of her conduct. It is not plausible that Defendants' decision was motivated by anything other than Calderone's extremely poor judgment and the overall outrageous nature of her conduct, regardless of whether her decision to fire her gun was ultimately determined to be legally justified in the context of a criminal case.

## B. Qualified Immunity

In the alternative, the individual defendants are protected by qualified immunity. A state actor is entitled to qualified immunity "unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018). Even if the Second Amendment does protect actual use of a gun in self-defense, that right is not clearly established. As discussed, Calderone

has not identified any case discussing, let alone establishing this right. Thus, the individual defendants are entitled to qualified immunity.

### C. *Monell*

Calderone has also failed to allege that the City has any policy, practice, or custom requiring termination for exercise of Second Amendment rights. Neither does she allege that either of the individual defendants was a policymaker for the City. Thus, even if she had alleged a violation of her Second Amendment rights, Calderone has failed to allege that the City could be liable for that violation under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

## II.   Due Process: Property Interest

The complaint next alleges that the individual defendants deprived Calderone of her property interest in her continued employment without due process of law as required by the Fourteenth Amendment. R. 20 ¶¶ 51-63. To state a claim for a procedural due process violation that relates to a property interest, a plaintiff must demonstrate "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Manistee Apts., LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016). Calderone adequately demonstrates her protectable property interest in continued employment by alleging that PCO II is a "for cause" position under both the City's Personnel Rules and her collective-bargaining agreement. R. 20 ¶¶ 8-11; *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 571 (7th Cir. 2017) ("It is well-established that a public employee who can only be terminated for good cause has a constitutionally protected property interest in continued

employment."). Calderone also adequately pleads that she was deprived of that property interest when she was terminated. R. 20 ¶ 27; *see also Grant*, 870 F.3d at 571. The parties dispute only whether the deprivation occurred without due process of law.

"An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). In general, "the right to some kind of prior hearing is paramount." *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972). But because "the *scope* of the right to a pretermination hearing is dependent upon the adequacy of post-termination remedies," *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 536 (7th Cir. 2008), the Court must briefly examine what post-termination remedies were available to Calderone.

In her position as PCO II, Calderone is subject to a collective bargaining agreement. R. 20 ¶ 52. Article 7 of that agreement includes extensive grievance and arbitration procedures. R. 23-3 at 3-9. Such "grievance and arbitration procedures can (and typically do) satisfy the requirements of post-deprivation due process." *Chaney v. Suburban Bus Div. of Reg'l Transp. Auth.*, 52 F.3d 623, 630 (7th Cir. 1995); *see also id.* at 628 (collecting cases across circuits). Indeed, Calderone does not allege that those provisions themselves fell short of due process requirements. She alleges instead that her arbitration was strategically delayed by the City in her specific case. *See* R. 20 ¶ 57 ("[S]he was left in limbo for over a year before the City agreed to

arbitrate her termination."); *id.* ¶ 59 ("[T]he only reason she suddenly is now getting an arbitration was after this case was filed, which plaintiff alleges is a litigation tactic being used by the City . . . ."). However, "because the relevant constitutional question is whether sufficient state-law protections *exist*, not whether sufficient protections were *afforded*, [a] complaint does not state a valid procedural due process objection . . . if it does not include a challenge to the fundamental fairness of the state procedures." *Michalowicz*, 528 F.3d at 534. Calderone makes no such challenge. Insofar as she thinks the City has not held up its end of the collective bargaining agreement, a remedy would lie in state law, not in a constitutional claim. *See McGreal v. Village of Orland Park*, 2013 WL 3984477, at *11 (N.D. Ill. Aug. 2, 2013) (explaining that the Illinois Public Labor Relations Act confers "exclusive jurisdiction on the Illinois Labor Relations Board over matters involving collective bargaining agreements between public employers and employees, including breach of contract claims"); *see also Mid-Am. Waste Sys., Inc. v. City of Gary*, 49 F.3d 286, 290 (7th Cir. 1995) ("[I]t is hard to see how failure to keep a promise contained in a contract can violate the due process clause.").

Since Calderone had adequate post-termination remedies under the collective bargaining agreement, she was entitled only to "truncated" pre-termination process, which "need only provide an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Michalowicz*, 528 F.3d at 536-37. Specifically, such pre-termination procedure must include "(1) oral or

written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his or her side of the story." *Head v. Chi. Sch. Reform Bd. of Trs.*, 225 F.3d 794, 803-04 (7th Cir. 2000).

Those minimum requirements were nominally met in this case. Calderone concedes that she received notice of her possible termination and that the notice outlined the charges against her, R. 20 ¶ 22-24; that she responded to the charges through her attorney, *id.* ¶ 25; and that a pre-termination hearing did occur, *id.* ¶¶ 27-28. Calderone does not allege that the City's procedures were unconstitutional on their face, but she nonetheless argues that she was deprived of a "meaningful opportunity to present [her] case." *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976). Specifically, she alleges that the pre-termination hearing was infected with bias, pervaded with hostility, and fundamentally predetermined—effectively rendering it a sham proceeding that did not protect against the erroneous deprivation of her property interest. R. 20 ¶ 28. This argument has a firm basis in law. *See Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir. 1982) ("No matter how complete the panoply of procedural devices which protect a particular liberty or property interest, due process also requires that those procedures be neutrally applied."); *id.* ("Due process requires that a hearing must be a real one, not a sham or a pretense."); *see also Ryan v. Ill. Dep't of Children & Fam. Servs.*, 185 F.3d 751, 762 (7th Cir. 1999) ("Due process requires that, prior to termination, an employee be given the chance to tell her side of the story, and that the agency be willing to listen.").

But "the constitutional standard for impermissible bias is high." *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (citing Ae*tna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)). "Adjudicators are entitled to a presumption of honesty and integrity." *Id.* Nevertheless, this presumption may be overcome, for example, by a demonstrating a pecuniary conflict of interest or by providing evidence of past abuse or criticism of the adjudicator. *See Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 716 (7th Cir. 2000). In *Levenstein v. Salafsky*, the Seventh Circuit determined that a medical school professor sufficiently alleged that his termination procedures were a sham in violation of his due process rights. 164 F.3d 345(7th Cir. 1998). Yet unlike Calderone, Levenstein had alleged an array of facts about his combative relationship with the defendants, about the protracted process by which he was constructively discharged, and about how the procedures used in his case, including the pre-termination hearing, violated the university's own policies. *Id.* at 350-52. Calderone provides no such allegations to suggest that the City's procedures were applied "vindictively or maliciously" or that the individual defendants demonstrated a "single-minded effort to discharge" her. *Ciechon*, 686 F.2d at 517. Moreover, Calderone's allegations of a "predetermined, formal and sham pre-disciplinary," R. 20 ¶ 28, are conclusory and therefore not entitled to a presumption of truth. *Twombly*, 550 U.S. at 555.

Ultimately, Calderone provides more detailed factual allegations about the *merits* of her administrative and criminal charges than about the *process* of the pre-termination hearing. Since this is a due process claim, that is a mistake. Although

Calderone alleges she was acquitted in her criminal trial based on a theory of self-defense, R. 20 ¶¶ 20, 54, such a result does not mean that due process was violated during her pre-termination hearing. Calderone was administratively charged with committing aggravated battery—not attempted murder like in her criminal proceeding. *Id.* ¶¶ 18, 24. A finding on one charge does not resolve the other charge, and of course the standards of proof are entirely different. And even if the administrative charges and criminal charges were identical in all material respects, the eventual acquittal still would not suggest a due process violation. Indeed, the "Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 350 (1976). Calderone was entitled only to an "initial check against mistaken decisions," *Loudermill*, 470 U.S. at 542, and she received that. Given her inability to furnish plausible allegations of bias or other meaningful problems at the pre-termination hearing, she has not stated a claim for deprivation of a property interest without due process.[4]

---

[4] The Court finds the parties' lengthy discussions of the *Parratt* doctrine inapposite. Under *Parratt v. Taylor*, when a deprivation results from "random and unauthorized" conduct rather than from "established state procedures," procedural due process is fully satisfied so long as there is a "meaningful post-deprivation remedy." *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 805 (7th Cir. 2010) (citing *Parratt v. Taylor*, 451 U.S. 527, 540-44 (1981)). However, "[s]ituations involving such random and unauthorized conduct are relatively rare." *Simpson v. Brown County*, 860 F.3d 1001, 1007 (7th Cir. 2017). The Seventh Circuit has held that conduct is only considered "random and unauthorized" where the state (1) "could not provide a pre-deprivation hearing as a practical matter," (2) "could not predict the conduct causing the deprivation," and (3) "did not enable the deprivation through established state

### III.    Due Process: Liberty Interest

Calderone claims that the individual defendants deprived her of a liberty interest in her occupation without due process of law as required by the Fourteenth Amendment. To succeed on a due process claim that is premised on a liberty interest, Calderone must adequately plead "(1) that she had a cognizable liberty interest under the Fourteenth Amendment; (2) that she was deprived of that liberty interest; (3) and that the deprivation was without due process." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013).

Calderone alleges that the individual defendants "caus[ed] her to be labeled as murderer and labeled as unable to perform in her job duties." R. 20 ¶ 81. Those labels, in turn, rendered her "unable to gain alternative comparable employment" in the field of "police dispatching, security, and related policing work." *Id.* ¶¶ 79, 89.

The Supreme Court has held that "mere defamation by the government does not deprive a person of 'liberty' protected by the Fourteenth Amendment, even when it causes 'serious impairment of [one's] future employment.'" *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (quoting *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)). But stigmatizing statements by a government actor can support a due process claim where the plaintiff also shows a concurrent "alteration of legal status"—i.e., the deprivation of an existing right or interest. *See Schepers v. Comm'r, Ind. Dep't of*

_____

procedures and a broad delegation of power." *Armstrong v. Daily*, 786 F.3d 529, 544 (7th Cir. 2015); *see also Zinermon v. Burch*, 494 U.S. 113, 136-39 (1990). That does not describe the allegations in this case.

*Correction*, 691 F.3d 909, 914 (7th Cir. 2012); *see also Paul v. Davis*, 424 U.S. 693, 708-09 (1976). This is known as the "stigma-plus" test. *Hinkle v. White*, 793 F.3d 764, 768 (7th Cir. 2015). Using this framework, the Seventh Circuit has made clear that "state employees have a liberty interest in not being discharged from their employment while being defamed such that they cannot get other government employment." *Strasburger v. Bd. of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998).

A former public employee seeking to vindicate her occupational liberty interest under the stigma-plus test must show that, in addition to being terminated, "(1) [s]he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) [s]he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001). Calderone fails to meet these requirements for at least two reasons. First, the stigmatizing conduct itself must be "false assertions of fact" that "come from the mouth of a public official." *Strasburger*, 143 F.3d at 356. These false statements must call into question the employee's "good name, reputation, honor, or integrity." *Head v. Chi. Sch. Reform Bd. of Trs.*, 225 F.3d 794, 801 (7th Cir. 2000). But Calderone merely alleges that the individual defendants "publicly placed her on administrative leave prior to her termination in a way that *made it appear* as if she did not act in self-defense . . . *causing her to be labeled* as a murderer and labeled as unable to perform her job duties." R. 20 ¶ 81 (emphases added). This is not enough. The administrative charges plainly did not label Calderone as a "murderer," *id.* ¶ 24, and Calderone has not alleged that the individual defendants did so in any public

statement. Even assuming the charges falsely "labeled" Calderone as "unable to perform her job duties," *id.* ¶ 81, such a description does not meet the threshold for a stigmatizing public disclosure. To simply label[] an employee as being incompetent or otherwise unable to meet an employer's expectations does not infringe the employee's liberty." *Head*, 225 F.3d at 801. Rather, the public disclosure must cast doubt on the employee's "good name, reputation, honor, or integrity." *Id.* at 801. Calderone has made no such allegation.

Second, the employee's reputation much be impugned in a way that "makes it virtually impossible for the employee to find new employment in his chosen field." *Townsend*, 256 F.3d at 670. Calderone does not allege any facts that plausibly suggest she was "blacklist[ed]" in this fashion. *Id.* She merely restates this element of the test, claiming that she "has been unable to gain alternative comparable employment." R. 20 ¶ 89. That is insufficient to state a claim for deprivation of a liberty interest without due process.

## IV. Constitutionality of Personnel Rules

Calderone also claims that the City's personnel rules are unconstitutionally vague and overbroad in violation of the Fourteenth Amendment. "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)). Calderone claims that the City's personnel policies "are overbroad in that

they impinge on rights protected under the Second Amendment, to wit, to carry a firearm for self-defense and to use it for self-defense." R. 20 ¶ 75.

The significant problem with this argument is that overbreadth is traditionally a First Amendment doctrine. *See United States v. Salerno*, 481 U.S. 739, 745 (1987); *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989). Calderone has not provided the Court with any overbreadth case outside the First Amendment context, and her argument for extending the doctrine to the Second Amendment confuses overbreadth with vagueness. R. 34 at 8. In any event, a bare request for extending the doctrine is insufficient without any reference to the doctrine's underlying purpose: preventing laws from "chilling the First Amendment rights of other parties not before the court." *Sec'y of State. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984); *see also New York v. Ferber*, 458 U.S. 747, 768 (1982) ("The doctrine is predicated on the sensitive nature of protected expression . . . .").

Even if Calderone had made a stronger argument for extending the overbreadth doctrine to the Second Amendment context, she fails to understand the mechanics of the doctrine. Calderone styles her overbreadth challenge as an "as-applied" one, but that is a non sequitur. "All overbreadth challenges are facial challenges[.]" *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). A law "should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications."

*New York v. Ferber*, 458 U.S. 747, 771 (1982). Calderone fails to provide any necessary allegations about the sweep of the City's personnel policies because she focuses exclusively on how those policies apply to her specific conduct.

The failure of an overbreadth claim, however, does not automatically doom a void-for-vagueness one. "[T]he void-for-vagueness doctrine protects against the ills of a law that 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 478-79 (7th Cir. 2012) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

Calderone argues that "she was not on notice that using her own handgun in self-defense would result in her termination under Subsections 15, 23, and 50 of the Personnel Rules." R. 34 at 8; *see also* R. 20 ¶ 76. But Calderone was terminated for: (1) violating the laws of Chicago and Illinois; (2) acting in a "discourteous" manner towards a member of the public; (3) "provoking or inciting" a member of the public to engage in abusive conduct; and (4) "conduct unbecoming an officer or public employee." It is not plausible that Calderone did not understand that discharging a gun could violate these personnel rules in any number of ways. Indeed, Calderone premises her entire case on a narrow exception (i.e., self-defense) to the general prohibition against shooting another person. Since it is generally a crime to shoot another person, Calderone certainly knew that taking that action could result in her termination.

## Conclusion

Therefore, Defendants' motions to dismiss, R. 23; R. 25, are granted. The motions are granted with prejudice because all of Calderone's claims, including the due process claims, are premised on the theory that it was unreasonable for Defendants to terminate her after she shot another person. This is a fundamentally implausible allegation, so leave to replead is not warranted.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  September 17, 2019